**Jerry and Phyllis PELHAM, Plaintiffs,**

v.

**UNITED STATES of America, et al., Defendants.**

Civ. A. No. 84–1935.

United States District Court, D. New Jersey.

June 4, 1987.

Stephen R. Long, Shanley & Fisher, P.C., Morristown, N.J., for plaintiffs.

Ralph J. Marra, Jr., Asst. U.S. Atty., Newark, N.J., for defendants.

## OPINION

HAROLD A. ACKERMAN, District Judge.

This personal injury action is brought by the plaintiffs, Jerry and Phyllis Pelham, against the United States, Allis Chalmers Corporation, Fairfield Tractor Company, Inc., L & H Construction Company ("L & H"), Catanzaro & Son Demolition Contractors, Ronald Davis, Ronald Davis Trucking Company, and four unidentified entities. It arises from conduct undertaken in 1982 on a construction and demolition project at the Picatinney Arsenal in Dover, New Jersey, a United States Army installation.

Defendant United States moves for reconsideration of my ruling of November 25, 1985 denying the government's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) or in the alternative, for summary judgment based on the discretionary function exception to the Federal Tort Claims Act (FTCA).

Under rule 12 I of the local rules of this district, the court will reconsider its prior ruling if it determines that it overlooked dispositive factual matters or controlling decisions of law.

The government urges two grounds in support of reconsideration: (1) that the court erred in converting its rule 12(b)(1) motion to a motion for summary judgment, and (2) that recent Third Circuit precedent overrules the analysis employed by the court under the FTCA. Because the government argues that new law controls the motion here, I have reconsidered my prior decision. However, for the reasons discussed *infra*, the government's motion to dismiss is still denied.

## STANDARD FOR VIEWING THE FACTS

Turning to the first ground, the government contends that the court incorrectly gave plaintiff the benefit of all favorable inferences when it is the plaintiff that has the burden of demonstrating jurisdiction. The government argues that without the benefit of factual inferences drawn in the plaintiff's favor, the court could not have found jurisdiction.

■ Reviewing the applicable law, I find that the government is correct in its contention that a motion for summary judgment is an improper vehicle for considering challenges to the subject matter jurisdiction of the court,[1] notwithstanding that the government sought summary judgment as an alternative form of relief. When challenged by a defendant, the burden of demonstrating federal jurisdiction rests with the pleader. *Tanzymore v. Bethlehem Steel Corp.*, 457 F.2d 1320, 1321 (3d Cir.1972). In considering a rule 12(b)(1) motion, the court must read the complaint liberally, taking all uncontroverted factual allegations in it as true. *See Schuer v.*

---

1. I note, however, that it appears that the Third Circuit has tacitly approved of converting a rule 12(b)(1) motion based on the discretionary function exception to the FTCA to a motion for summary judgment when submissions outside the pleadings are considered. *See Pennbank v. United States,* 779 F.2d 175, 177 (3d Cir.1985) ("Because the district court considered matters outside the pleadings, it appropriately treated

the motion as one for summary judgment."); *Bernitsky v. United States,* 620 F.2d 948, 956 (3d Cir.), *cert. denied,* 449 U.S. 870, 101 S.Ct. 208, 66 L.Ed.2d 90 (1980) ("summary judgment would have been appropriate as the court had a factual record upon which to determine whether the discretionary function exception applied and plaintiff had the opportunity to submit opposing affidavits").

*Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). The court may not be aided by presumptions or argumentative inferences drawn from the pleadings. *Norton v. Larney,* 266 U.S. 511, 515, 45 S.Ct. 145, 147, 69 L.Ed. 413 (1924). It necessarily follows then that the burden may not be switched and imposed on the movant when the basis for seeking judgment is a challenge to the jurisdiction of the court.

 It was unnecessary for the court to convert the motion to one for summary judgment, however, for the court may properly look to affidavits, depositions and other extra-pleading material in determining its own jurisdiction. *Tanzymore,* 457 F.2d at 1323. Therefore, the only practical difference between challenging jurisdiction under rule 56 and rule 12(b)(1) is the way the court construes the facts. Thus, in determining jurisdiction, the court may not provide the nonmovant the benefit of favorable influences, but must determine whether, based on all of its submissions to the court, the nonmovant has borne its burden of demonstrating its entitlement to a federal forum.

The foregoing being so, however, I reject the government's argument that plaintiffs benefitted from favorable factual inferences in my previous opinion. At this point, a review of the facts utilizing the appropriate rule 12(b)(1) standard is in order.

Plaintiff Jerry Pelham worked as a construction laborer for a subcontractor engaged in a construction and demolition project at Building 65 at the Picatinney Arsenal. The project was being carried out pursuant to an agreement between an Army Corps of Engineers and defendant L & H, the general contractor at the job site.

On May 25, 1982, during the demolition phase, plaintiff was called to attach cables to a roof-support suspension beam. He was instructed to stand in a metal garbage dumpster to be lifted on the forks of a forklift to the suspension beam approximately twenty feet above floor level. As the box was being lifted with plaintiff in it, the forklift lurched, causing plaintiff to lose his balance. His hand was caught between the forklift mast chain and pulley, amputating portions of three fingers and severely lacerating a fourth on his left hand.

The contract between the Army Corps of Engineers and L & H governing the demolition and construction phases of this project, which is part of the record of this case, explicates the respective responsibilities of the contractor and the "contracting officer," the person executing the contract on behalf of the government or his or her authorized representative. General Provision 1(b). General Provision 10 provides that all work is subject to the government's inspection at all reasonable times for the government's benefit but that "any such inspection ... shall not relieve the Contractor of the responsibility of providing quality control measures to assure that the contract strictly complies with the contract requirements." Moreover, the contract requires the contractor to personally supervise the work done, General Provision 11, bring the job in compliance "with any applicable Federal, state and municipal laws, codes and regulations," General Provision 12, and generally "take proper safety and health precautions to protect the work, the worker, the public and the property of others," General Provision 12.

General Provision 52 of the contract specifically addresses accident prevention.[2]

---

**2.** Provision 52 reads in its entirety:

52. ACCIDENT PREVENTION

(a) In order to provide safety controls for protection to the life and health of employees and other persons; for prevention of damage to property, materials, supplies, and equipment; and for avoidance of work interruptions in the performance of this contract, the Contractor shall comply with all pertinent provisions of Corps of Engineers Manual, EM 385–1–1, dated April 1981, entitled "Safety and Health Requirements Manual", as amended, and *will also take or cause to be taken such additional measures as the Contracting Officer may determine to be reasonably necessary for the purpose.*

(b) The Contractor will maintain an accurate record of, and will report to the Contracting Officer in the manner and on the forms prescribed by the Contracting Officer, exposure data and all accidents resulting in death, traumatic injury, occupational disease, and

Provision 52(a) states that the contractor shall comply with the pertinent provisions of the Army Corps "Safety and Health Requirements Manual" and "take or cause to be taken such additional measures as the Contracting Officer may determine to be reasonably necessary for the purpose." The contractor must maintain records on and report to the contracting officer on any accident. General Provision 52(b). General Provision 52(c) provides: "The Contracting Officer will notify the Contractor of any noncompliance with the foregoing provisions and the action to be taken." It also provides that if the contractor refuses to comply with a safety order, the contracting officer can issue a stop-work order. Moreover, General Provision 52(e) requires the contractor to submit, before the commencement of construction, written proposals for effectuating these accident prevention provisions. The safety program proposed by L & H pursuant to General Provision 52(c) provided that project superintendent Lawrence R. Maffie assumed full responsibility to "enforce, monitor, record and report on all safety measures." Safety Program, Exh. 4 to the Affirmative of Ralph Marra. Finally, General Provision 52 states: "The work will be conducted under the general direction of the contracting officer and is subject to inspection by his appointed inspectors to insure strict compliance with the terms of the contract."

The government's project engineer at the site was Frederick A. Labudzinski. According to his own deposition, Mr. Labudzinski's duties included monitoring compliance with the plans and specifications of the contract, which included the general provisions of the contract and their safety provisions. *See* Labudzinski Dep. at 15–18, Exh. D to Plaintiff's Brief in Opposition to Summary Judgment. Mr. Labudzinski spent ten to twenty percent of his time performing on-site tasks. *Id.* at 20. Throughout the demolition phase of the project, during which plaintiff was injured, either Mr. Labudzinski or an assistant inspected the project on a daily basis. *Id.* at 34.

Sometime shortly before plaintiff's injury, Mr. Labudzinski inspected the demolition site and first observed a worker in a metal container in the air hoisted by the forklift. *Id.* at 37–38. When asked whether he believed this procedure met safety requirements, Mr. Labudzinski testified at deposition as follows:

Q. Did you think the practice of having a worker present in a metal container contained on the forks of a forklift suspended in the air met the safety requirements of the general provisions of the building 65 contract when you saw it on the one or two occasions that you did before Mr. Pelham was injured?

A. I raised the issue with the superintendent for L & H Construction, Larry Maffie, M-A-F-F-I-E, Lawrence Maffie on the practice. He assured me that that was, it I recall, standard procedure for that type of demolition.

Q. Are you finished?

A. Yes.

damage to property, materials, supplies and equipment incident to work performed under this contract.

(c) *The Contracting Officer will notify the Contractor of any noncompliance with the foregoing provisions and the action to be taken.* The Contractor shall, after receipt of such notice, immediately take corrective action. Such notice, when delivered to the Contractor or his representative at the site of the work, shall be deemed sufficient for the purpose. *If the Contractor fails or refuses to comply promptly, the Contracting Officer may issue an order stopping all or part of the work until satisfactory corrective action has been taken.* No part of the time lost due to any such stop orders shall be made the subject of claim for extension of time or for excess costs or damages by the Contractor.

(d) Compliance with the provisions of this clause by subcontractors will be the responsibility of the Contractor.

(e) Prior to commencement of the work the Contractor will:

(1) submit in writing his proposals for effectuating this provision for accident prevention;

(2) meet in conference with representatives of the Contracting Officer to discuss and develop mutual understandings relative to administration of the over-all safety program.

(DAR 7–602.42(a) & (b)).

(Emphasis supplied).

Q. Did you think the practice of having a worker suspended in a container on the forks of a forklift met the safety provisions of the general provisions of the building 65 contract when you saw it on the one or two occasions that you did before Mr. Pelham's injury?

A. Yes.

Q. You mentioned that you raised an issue with Mr. Maffie. What did you see as the issue?

A. The issue was the fact of combining two pieces, or one piece of equipment with something that was—seemed to me at the time to be foreign to that piece of equipment and use it concurrently. Although my experience has been in construction field that there is not a specific piece of equipment for every specific task that is performed and thereby requiring makeshift, if you will, pieces of equipment to get a particular job done.

\* \* \* \* \* \*

Q. Were you satisfied with the explanation Mr. Maffie gave to you about standards of practice and procedure?

A. *During our conversation, my brief inquiry, it is my recollection that I reminded Mr. Maffie of his obligation as far as safety of working conditions on the job site was concerned.* But other than that, I don't recall any conversation past that.

*Id.* at 40–41, 44 (emphasis added).

According to Stephen Durski, a resident engineer for the Army Corps of Engineers who was Mr. Labudzinski's supervisor at the time of plaintiff's injury, the Corps' responsibilities on construction projects changed significantly about fifteen years ago. At that time, the Corps shifted all responsibility for quality control, including that for safety, onto the contractor. Durski Reply Affirmation ¶ 6. The Corps field staff became contract monitors rather than inspectors. According to Mr. Durski, the staff members "were only generally familiar with safety regulations, and except for occasions when they spotted obvious safety violations, like failure to wear hardhats,

they were to rely on the contractor as to safety." *Id.*

In my previous opinion, based upon these facts, the court found that Mr. Labudzinski perceived a "safety issue" in the use of the forklift apparatus to lift workers and even brought this suspected deficiency to the contractor's attention. *See* Transcript of Opinion at 7, 13. I further found that at this point he accepted the contractor's response rather than determining whether the contract specifications were being complied with as he would have done had he suspected, for example, that the wrong materials were being used in construction. I concluded that once he suspected a safety violation, Labudzinski's duty to check safety requirements was ministerial and not discretionary within the meaning of the discretionary function exception.

As indicated in my previous opinion, the FTCA, 28 U.S.C. §§ 1346(b), 2671–2680, operates as a waiver of traditional sovereign immunity. The Act authorizes suits against the United States for damages

> for injury or loss of property, or personal injury or death caused by the neglect or wrongful act or omission of any employee of the government while acting within the scope of his office or employment, under circumstance where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

Certain cases are excepted from this broad waiver of immunity under the "discretionary function exception." This exception, set forth at 28 U.S.C. § 2680(a), shields the government from liability for

> [a]ny claim based upon an act or omission of any employee of the government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the government, whether or not the discretion involved be abused.

The government argues that the court's holding that the project engineer was exercising a ministerial duty, not a discretionary function, was premised on two factual findings which depended on inferences improperly drawn in plaintiff's favor. The government takes issue first with the court's finding that General Provision 52(c) required Labudzinski to report contract noncompliance to the contractor. The government contends that the court failed to read this provision in the context of the other applicable contractual provisions which lay the burden of safety compliance on the contractor.

 This argument must be rejected as a finding that the project engineer had supervisory powers over safety compliance is fully consistent with all provisions of the contract. It is true as the government contends that the contractor bears responsibility for complying with the contract's safety provisions. However, the contract unequivocally states that "[t]he Contracting Officer *will* notify the contractor of noncompliance with these requirements." *See, e.g.,* General Provision 52(c). Thus, through use of the word "will," the contract clearly accords the contracting officer with oversight responsibilities over the contractor's final compliance obligation. While the contracting officer's implementation of an inspection program for detecting safety breaches may be discretionary, once the officer suspects a safety deficiency, he or she does not have discretion as to whether or not act upon it. This finding is in no way contradictory to a full reading of all pertinent contractual provisions and in no way rests on inferences drawn in plaintiff's favor. Thus, this argument does not warrant dismissal.

The government next argues that the court's finding that Mr. Labudzinski detected a safety issue was also based on improper inferences. According to the government, the record indicates that the only issue perceived by the project engineer was whether it was appropriate to mate the two pieces of equipment involved.

 However, in making this argument in its brief, the government overlooks the Labudzinski's statement, quoted with emphasis *supra,* which indicates that at the time he asked the contractor about the use of the equipment, he reminded the contractor about his safety obligations. *See* Labudzinski Dep. at 44. This statement directly indicates that Mr. Labudzinski suspected a safety violation not merely an unusual coupling of equipment. It is therefore clear that the court's finding did not rely on any improper inferences. Thus, I decline to reverse my previous ruling on this ground.

## THE DISCRETIONARY FUNCTION EXCEPTION TO THE FTCA

The government's next argues that dismissal is required under two Third Circuit cases decided since my previous opinion which, it contends, overrule the reasoning I applied in finding that the discretionary function exception was inapplicable. A review of the most recent Supreme Court case on the discretionary function exception, *United States v. S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984), is necessary to an understanding of the recent Third Circuit cases.

In *Varig,* the Supreme Court held that the actions of the Federal Aviation Administration (FAA) in promulgating a "spot check" program to monitor the aviation industry's compliance with FAA safety requirements and the program's application to the facts therein were protected by the discretionary function exception. In so holding, the Court found that Congress empowered the Secretary of Transportation to establish a program for safety compliance according to her "judgment of the best course." *Id.* at 816, 104 S.Ct. at 2765 (quoting *Dalehite v. United States,* 346 U.S. 15, 34, 73 S.Ct. 956, 967, 97 L.Ed. 1427 (1953)). Moreover, the Court identified two factors that must be considered in determining the applicability of the discretionary function exception: (1) whether the challenged acts are of the nature and quality that Congress intended to shield from tort liability, and (2) whether the challenged

conduct involves the government acting in its capacity as regulator of individual conduct. 467 U.S. at 813–14, 104 S.Ct. at 2764. According to the *Varig* court, Congress enacted the exception "to prevent judicial 'second guessing' of legislative and administrative decisions grounded in social economic and political policy through the medium of an action in tort." *Id.* at 814, 104 S.Ct. at 2764.

Since my previous opinion, the Third Circuit has decided four cases relevant here on the discretionary function exception. In the first, *Pennbank v. United States,* 779 F.2d 175 (3d Cir.1985), two banks which had provided interim financing for a federally approved sewer system sued the United States, the Environmental Protection Agency, the Farmers Home Administration and the Department of Agriculture alleging that they negligently inspected the system and failed to detect its construction defects. In analyzing the discretionary function exception, the court looked to the two *Varig* factors as well to its legislative history which provides that the exception is

> designed to preclude application of the act to a claim based upon an alleged abuse of discretionary authority by a regulatory or licensing agency ... It is neither desired nor intended that the legality of regulations, or the propriety of a discretionary administrative act should be tested through a damage suit for tort. The same holds true of other administrative action not of a regulatory nature, such as the expenditure of Federal funds, the execution of a Federal project, and the like.

Hearings on H.R. 5373 and H.R. 6463 before the House Committee on the Judiciary, 77th Cong.2d Sess. 28, 33 (1942) (quoted in *Pennbank,* 779 F.2d at 178–79). The court reasoned that the processes utilized by the agencies in awarding federal funds clearly involve the exercise of discretion. The court also found that the responsibility of these agencies to inspect construction plans and progress was only for the benefit of the agency and "only as a safeguard against wasteful, negligent or illicit use of government money." 779 F.2d at 180. Significantly, the court determined that

[n]either in the agency agreements with the Authority nor in the bank's loan agreements to the Authority is found the responsibility of the government to monitor the construction itself. Rather, the government conduct at issue is exclusively to "oversee ... the [federal] money being spent on the work."

*Id.* (quoting *Pennbank v. United States,* 599 F.Supp. 1573, 1580 (W.D.Pa.1985)). The court concluded that this conduct, wholly related to the expenditure of federal funds, was of the type Congress intended to shield from tort liability. 779 F.2d at 180.

In *Pooler v. United States,* 787 F.2d 868 (3d Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 175, 93 L.Ed.2d 111 (1986), the court considered the government's liability for negligence in an allegedly unlawful arrest and prosecution. In finding that the government's use of a confidential informant and its decision to prosecute were discretionary functions for which there was no judicial review, the court cited the distinction drawn by the Supreme Court in *Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), between decisions made at the planning level, which are discretionary, and those made at the operational level, which are not. 787 F.2d at 870.

The *Pooler* decision was followed by *Merklin v. United States,* 788 F.2d 172 (3d Cir.1986). Plaintiff Merklin worked for a company which, under agreement with the Atomic Energy Commission (AEC), extracted thorium hydrozide from a radioactive ore provided by the AEC. After developing cancer, plaintiff sued the government alleging failure to inspect the extraction facility, failure to ensure the facility was safe and failure to warn of the dangers of the radioactive material. In finding that this conduct implicated the discretionary function exception, the court noted that Congress granted the AEC a wide scope of discretion in the administration of the Atomic Energy Act. 788 F.2d at 174. The court found that the conduct in issue was clearly the kind of regulatory conduct described by the court in *Varig* and quoted

*Varig's* pronouncement that "[w]hen an agency determines the extent to which it will supervise the safety procedures of private individuals, it is exercising discretionary regulatory authority of the most basic kind." *Id.* (quoting *Varig*, 104 S.Ct. at 2768).

In so holding, the Third Circuit distinguished *McMichael v. United States*, 751 F.2d 303 (8th Cir.1985). In *McMichael*, plaintiffs sought recovery for deaths and injuries caused by an explosion at a company producing highly-explosive cartridges under contract with the Department of Defense. The Eighth Circuit found this situation to be distinctly different from the facts of *Varig* and held that the discretionary function exception did not bar suit. First, the court found that unlike in *Varig*, the government was pursuing a proprietary rather than a regulatory function. 751 F.2d at 306. Next, the court noted that in *Varig*, the FAA had made a policy decision imposing primary safety responsibilities on the manufacturer. In particular, the manufacturer conducted the aircraft safety inspections. In its case however, the court found that the Defense Department had quality assurance inspectors having important safety responsibilities. In support of this contention, the court cited contract provisions similar to those at issue here, providing that the inspectors were responsible for assuring contract safety clauses and monitoring compliance with them. *Id.* at 307. The inspectors also had numerous precise inspections to perform. *Id.* The court thus concluded that the inspectors did not make discretionary regulatory judgments and were thus not protected by the discretionary function exception.

Most recently, the Third Circuit decided *Smith v. Johns-Manville Corp.*, 795 F.2d 301 (3d Cir.1986). The original plaintiffs in that case, all present or former employees of the Johns-Manville Corp., sought recovery for injuries or deaths caused by exposure to asbestos products. Several defendants filed cross-claims or third-party claims against the United States for indemnity and contribution based on its supplying of asbestos to a corporations through a plan promulgated by the General Services Ad-

ministration (GSA) pursuant to the Strategic and Critical Materials Stock Piling Act, 50 U.S.C. § 98–98h–1 (1976), which governed the disposal of surplus strategic materials. The Act empowered the GSA to fix the plan and date of disposition of the surplus asbestos "with due regard to the protection of the United States against avoidable loss on the sale or transfer of material to be released." 50 U.S.C. § 98b(e). Congress authorized disposition on four occasions. Pursuant to its plan, the GSA sold the asbestos "as is" in the original packaging without any warnings. 795 F.2d at 305.

In analyzing whether the asbestos disposal involved a discretionary function, the *Smith* court looked to the two *Varig* factors as well as the Supreme Court's decision in *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). In *Dalehite*, plaintiffs were injured in explosions caused by fertilizer transported by the federal government to countries whose economies had been hurt by World War II. The *Dalehite* court stated that the discretionary function exception protected from suit "the discretion of the executive or the administrator to act according to one's judgment of the best course .... It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision, there is room for discretion." *Id.* at 34–36, 73 S.Ct. at 967–68. According to the court, Congress enacted the exception to shield the government from liability for conduct involving "an authorized activity such as a flood-control or irrigation project." *Id.* at 30, 73 S.Ct. at 965.

Based on *Dalehite* and *Varig*, the *Smith* court found that the Act left the disposal of asbestos to the discretion of the GSA and that the exception thus barred suit. It also held that the failure to label was part of the GSA sales plan and was also covered. In so ruling, the Third Circuit rejected this court's reasoning below that the decision not to label did not involve considerations of public policy and therefore was not pro-

tected under the exception. Addressing this reasoning, the court stated:

> The position that agency decisions can be broken down into component parts is fundamentally at odds with the Court's teaching in *Dalehite* that the exception bars suits challenging administrator's decisions initiating programs and establishing plans in accordance with official directions. The test is not whether the government actually considered each possible alternative in the universe of options, but whether the conduct was of the type associated with the exercise of official discretion.

795 F.2d at 308–09.

The government relies on *Merklin* and *Smith,* to argue that the action here is of the type associated with the exercise of discretion, and that it involved the regulation of conduct of individuals, the two factors to be considered under *Varig.* As to the first factor, the government argues that the Corps' action on the Building 65 project were taken pursuant to a broad statutory mandate; that its job was to monitor contract compliance, not serve as an inspector; and that the Corps monitored by implementing, in effect, a spot check program. Moreover, the government contends that in holding previously that the discretionary function exception did not apply, the court improperly broke the Corps quality control/quality assurance program into component judgments, contrary to the Third Circuit's admonition in *Smith.* As to the second *Varig* factor, the government argues that the conduct here, like the inspections conducted by the AEC in *Merklin,* constituted "discretionary regulatory authority of the most basic kind."

I reject both contentions. Addressing the first factor, the demolition and construction program employed by the Corps for use on this project at the Picatinney Arsenal was developed pursuant to a broad Congressional policy found in 10 U.S.C. § 2301(a)(1). This section states in pertinent part:

> The Congress finds that in order to ensure national defense preparedness, to conserve fiscal resources, and to enhance defense production capability, it is in the interest of the United States to acquire property and services for the Department of Defense in the most timely, economic and efficient manner. *It is therefore the policy of Congress that services and property ... for the Department of Defense be acquired by any kind of contract ... that will promote the interest of the United States.*

(Emphasis supplied).

■ Moreover, 10 U.S.C. § 2851(a) provides guidelines as to completion of construction contracts:

> Each contract entered into by the United States in connection with a military construction project ... shall be carried out under the direction and supervision of the Secretary of the Army, ... the Secretary of the Navy ... or such other department or Government agency as the Secretary of Defense approves to assure the most efficient expeditions and cost-effective completion of the project.

Pursuant to these sections, the government clearly had discretion in the formulation of construction contracts and determination of how such construction is to be completed. I have no doubt that no negligence action could be maintained for faulty development of safety provisions or of a spot check compliance program for the Building 65 contract.

■ However, negligence in the development of the safety provisions or a spot check program is not the kind of conduct at issue here. Here, the conduct involved the ministerial *implementation* of safety regulations rather than the discretionary authority to develop such provisions. More specifically, as discussed *supra,* the record indicates that Mr. Labudzinski observed a suspicious practice and asked the contractor in so many words whether use of forklift apparatus conformed to safety regulations. Mr. Labudzinski accepted the contractor's response rather than assuming his ministerial responsibility under the contract to enforce compliance. Under the contract, there is nothing discretionary about this responsibility. As the Supreme Court in *Dalehite* specifically recognized, decisions

made at the operational level, as distinguished from the planning level, are not protected by the discretionary function exception. *See Dalehite,* 346 U.S. at 42, 73 S.Ct. at 971. Thus, this conduct is not of the type "associated with the exercise of official discretion" under the first *Varig* factor.

Moreover, I reject the government's contention that the safety provisions in this contract are akin to the spot check program of *Varig.* General Provision 52(c) does not limit the contracting officer's authority to enforce the safety provisions to sporadic periods. Rather, it mandates him to police compliance on a continuous basis.

This analysis is readily distinguishable from that rejected by the Third Circuit in *Smith.* There, this court erroneously found that a decision properly *committed to the planning level of the asbestos disposal program* involved no public policy considerations that required the exercise of judgment. The court improperly sought to compartmentalize a decision which was part of a larger discretionary scheme. Here, the conduct involves the enforcement of a provision of a plan developed pursuant to discretionary authority which of itself does not involve policy judgment. I thus reject the government's argument that *Smith* requires a different result.

Moreover, I reject the government's argument that the conduct of the Corps here is the kind of regulatory activity encompassed by the second *Varig* factor. In discussing this factor, the *Varig* court specifically referred to the actions of regulatory agencies. The agency involved in *Merklin,* the Atomic Energy Commission, clearly satisfied this factor as it was mandated to regulate the conduct forming the basis of that action, the processing of radioactive materials. Here, the Army Corps of Engineers operated under no regulatory statutory mandate. Its supervisory power here soley emanated from the contract and it was limited to assuring compliance with its provisions.

Indeed, the circumstances here are closely analogous to the conduct which the Eighth Circuit found amenable to suit in *McMichael v. United States,* discussed *supra.* In both cases, the government had specific responsibility for ensuring safety. In both cases the conduct at issue is failure to enforce safety requirements. The application of the *McMichael* holding here where no policy judgment is implicated is consistent with the ruling of *Merklin. See* 788 F.2d at 175.

For the foregoing reasons, I find upon reconsideration of my ruling in light of new law, that the same result still obtains: The United States' motion for dismissal is denied.

An order accompanies this opinion.