**Farid S. KHAIR, Plaintiff,**

v.

**CAMPBELL SOUP COMPANY, Defendant.**

Civ. A. No. 93–1626(JEI).

United States District Court, D. New Jersey.

June 12, 1995.

Opinion Granting Reconsideration in Part July 3, 1995.

Harold I. Goodman (argued) Eugene McGurk, Raynes, McCarty, Binder, Ross & Mundy, Philadelphia, PA, for plaintiff.

Jerome A. Hoffman (argued), Matthew V. DelDuca, Dechert Price & Rhoads, Princeton, NJ, for defendant.

## OPINION

IRENAS, District Judge:

This is an age, race, and national origin discrimination action brought by Farid S. Khair against his employer Campbell Soup Company ("Campbell") alleging discriminatory transfer, failure to promote, and retaliation claims under Title VII, 42 U.S.C. § 2000e *et seq.;* the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.;* 42 U.S.C. § 1981 ("§ 1981"); and the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5–1 *et seq.* Campbell has filed a counterclaim asserting that Khair breached his duty of loyalty to Campbell by releasing confidential personnel information. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. Plaintiffs' NJLAD action and Camp-

bell's counterclaim is cognizable under the Court's supplemental jurisdiction. 28 U.S.C. § 1367(a).

Campbell has moved pursuant to Fed. R.Civ.P. 56 for summary judgment (i) dismissing all claims in plaintiff's complaint and (ii) finding plaintiff liable on its counterclaim. Plaintiff's § 1981 claim that arose prior to the enactment of the Civil Rights Act of 1991—the discriminatory transfer/failure to promote claim—is dismissed because it fails to state an actionable claim under *Patterson.* The motion for summary judgment on plaintiff's discriminatory transfer/failure to promote claim under Title VII, the ADEA, and the NJLAD is denied because we find they were filed within the relevant statute of limitations period and because plaintiff has produced sufficient evidence to create a triable issue of fact. Plaintiff's evidence fails to create a triable issue of fact on the remaining § 1981 claims, the failure to promote in 1992 claims, and the retaliation claims, and these claims will be dismissed. There are disputed issues of fact surrounding defendant's counterclaim, and thus Campbell's summary judgment motion to find plaintiff liable on the counterclaim is denied.

## I. *FACTUAL BACKGROUND*

Khair was born in Egypt on June 21, 1945. In 1985 plaintiff became a United States citizen. He began working at Campbell as an Accounting Clerk on July 23, 1980. Plaintiff was promoted to Senior Lead Clerk in 1981, to Accountant in 1983, to Supervisor–Accounting in 1984, to Supervisor of the General Ledger in 1984, and to Manager–Financial Systems Control in 1986. When he was promoted to Senior Lead Clerk and Accountant in 1981 and in 1983, he received a lower pay scale than the employees he replaced. He believes these jobs were downgraded because of national origin discrimination. When plaintiff complained in 1983, Campbell took steps to adjust plaintiff's salary.

From 1986 to 1990, Khair's title was Manager–Financial Systems Control. Plaintiff was responsible for managing and administering the general ledger, a computerized financial system which maintains the financial transactions of Campbell and ten other associated entities. According to Campbell's Position Information Questionnaire ("PIQ"),[1] plaintiff managed the reconciliation of sixty-six bank accounts and Campbell's accounts receivable system.

In 1986 and 1987, plaintiff reported to Joseph Collepardi. In the 1986 annual review, Collepardi said plaintiff was "ready for a higher level managers position," and in 1987, Collepardi said Khair was "promotable today." (Pl.Ex. 10.) In 1987, Khair was given an overall performance rating of "5" on a scale of 1 to 6, where "6" was the highest score. Collepardi recommended Khair for an Award of Excellence.

Plaintiff's supervisor from 1988 until 1991 was John Shimrak, Controller, Accounting Services (age 49). Shimrak supervised the Financial Systems department (headed by Farid Khair, age 46, level 26 [2]), the Payroll Services department (Jack Lyons, Director, age 56, level 34), Accounting Systems department (John Yecco, age 35, level 32), and the Savings Plan department (managed by Fran Stronski, age 51, level 30). Plaintiff claims that Shimrak has promoted younger, native-born employees while his job level, 26, has not changed since 1986.[3]

Plaintiff claims that Shimrak made the following demeaning comments about Khair's ancestry. In June and July of 1988, Shimrak addressed Khair as his "Egyptian friend." In October or November of 1990, Shimrak repeatedly expressed his anger at having American troops fighting a war in the Middle East. On January 10, 1991, Shimrak wondered what would happen in the department if Khair were "hit by a camel." On March 1, 1991, Shimrak characterized a problem in the

---

1. This document was signed by plaintiff and his immediate manager.

2. At Campbell salaries are determined by levels. When an employee reaches level 30, she is eligible for a bonus.

3. Plaintiff names five employees who have been promoted from Shimrak's operation who are younger and native-born: Sherry Miller (born 8/27/59); William Langford (born 12/14/57); Larry Tursi (born 5/30/61), Raymond Dobry (born 4/8/60), and Russell Turco (born 9/13/61).

office as "an Egyptian curse." In January, 1992, referring to a problem-solving idea proposed by Khair, Shimrak asked Khair, "Is [this] the Egyptian way [of] handling such matters?" (Pl.Ex. 7.) There is deposition testimony from another Campbell employee that Shimrak "light-heartedly kidded" the plaintiff about his Egyptian origin. (Turco Dep. at 32.)

Plaintiff claims that Shimrak acted on his alleged antipathy towards the plaintiff. Plaintiff contends that in December, 1988, and again in January and February of 1989, Shimrak assigned additional responsibilities to plaintiff but failed to promote him. At the same time, three other employees received promotions (John Yecco, Bill Langford, and Larry Tursi). When plaintiff complained, Shimrak allegedly promised to increase his job level but never did so. Meanwhile, plaintiff avers younger employees continued to be promoted. Shimrak promoted Sherry Miller in 1989 and 1990 when she was twenty-nine and thirty years old; he promoted Russ Turco in 1989 at age thirty; and he promoted Ray Dobry in 1990 when he was thirty years old. Plaintiff also claims he had the highest performance rating in the Accounting Services department from 1987 to 1990.

In August of 1990, Shimrak transferred some of plaintiff's job responsibilities to another employee, John Yecco. The duties shifted involved the preparation of several of the financial reports that are submitted to Campbell's officers. Plaintiff maintains that Shimrak told Khair that the reason for the change was that Yecco was not busy enough. At Yecco's deposition, Yecco said he did not know why the duties were transferred. (Yecco Dep. at 234.) In December, 1990, plaintiff says he told Shimrak of his frustrations. Plaintiff claims that Shimrak smiled and said "let me see what I can do." (Pl.Br. at 11.)

On January 10, 1991, plaintiff received his annual performance review. Shimrak described plaintiff as a "highly dedicated professional" and a "valuable employee" whose work "set the example for many other departments to follow." (Def.Ex. I.) The annual review noted that Khair would soon be assigned to the Pension Department as project manager for a new pension system. He was rated "4" in overall performance on a five point scale, with "5" being the best.

In July of 1990, Campbell changed its performance ratings system from a six point scale to a five point scale. Data provided by the plaintiff suggests that under the six point scale, 0% to 1% of all employees received a "6." (Pl.Ex. 24.) Under the suggested distribution for the five point scale, 15% of employees would rate a "5." (Pl.Ex. 22.) Khair asserts that at least eight other employees under Shimrak's supervision received a "5" in 1990. Khair believes his "4" rating was a downgrade. Campbell maintains that the change in grade was a result of the change in scale.

In December of 1990 or early January of 1991, Shimrak claims that he offered plaintiff a transfer, and plaintiff accepted this offer willingly. Khair's new job was project manager for the installation of a new company-wide pension administration computer system known as PensionManager. Shimrak testified that he picked Khair for this position because he had had some discussions with the plaintiff about his career opportunities, and it occurred to Shimrak that the new position "might have been an opportunity for [Khair] to broaden his experience, his background with Campbell Soup Company." (Shimrak Dep. at 203.) The project manager would report to Jack Lyons, Director of Payroll Services.

Plaintiff avers that he did not accept this transfer without objection. Rather, plaintiff expressed his concern that after the job as project manager was complete, he would no longer have a job, and he asked Shimrak if he could continue to perform both jobs. Shimrak denied this request. According to Khair, Shimrak told him that the transfer had been approved by Shimrak's supervisor, Ray Meillier, Vice President for Financial Services, and was final. Allegedly Shimrak also told plaintiff: "I have to have a back-up for your position ... I don't know what to do if you are hit by a camel after leaving this place." (Pl.Br. at 12.)

Plaintiff requested a meeting with Meillier. Shimrak attended the meeting, which oc-

curred approximately one week after his performance review. At this meeting, plaintiff's performance review was discussed. Meillier assured plaintiff that his change in grade was not a promotion; in fact, Meillier showed plaintiff his own performance review for 1990 in which, like the plaintiff, he was given a "4" rating. During the meeting, plaintiff questioned whether he would have a job with Campbell when the PensionManager installation project was complete, and Meillier told Khair that he would not be fired. Nevertheless, plaintiff asked to keep his former job as Manager–Financial Systems Control. Meillier allegedly told the plaintiff that he could either take the transfer or look for a job at another company. Plaintiff accepted the new assignment, which was announced on January 24, 1991, and became effective on February 1, 1991.

After plaintiff switched jobs, Shimrak transferred the plaintiff's former job responsibilities, including management of the general ledger, to the Accounting Systems department directed by John Yecco. Yecco recommended Sherry Miller (a Black female, age 34, level 26) for manager of the general ledger function. Shimrak accepted this recommendation.

Plaintiff submits that his new assignment was a position that did not exist and would not be permanent. In a memo dated December 14, 1990, Shimrak requested approval from the Pension Administration Committee to expend approximately $300,000 of the pension trust funds to purchase PensionManager, a PC-based pension administration system from Towers Perrin. In this proposal, Shimrak stated that additional staff would be utilized to install the project, but after installation, his goal was to utilize the staff that had existed before implementation. In response to this proposal, the Committee suggested that Shimrak obtain bids from other vendors. Approval for the PensionManager project was secured on April 3, 1991, two months after the plaintiff's transfer.

Plaintiff presents additional facts that he claims are evidence that the PensionManager position would not be a permanent position. First, plaintiff's new position was never submitted for approval to the Human Resources Department or the Compensation Department. No PIQ was created describing the duties of plaintiff's new position as Manager–Payroll Services. Nor was the new title reflected on plaintiff's change of status form, a document that notes all changes associated with an individual's employment at Campbell. There is a PIQ that reflects the assignment to Sherry Miller of some of Khair's former duties with respect to the general ledger. Miller's PIQ was received by the Human Resources Department on January 24, 1991. According to Miller and Yecco, the decision to transfer Khair's general ledger work had been made by late December, 1990 or early January, 1991. Finally, plaintiff notes Shimrak, Lyons, Ray Dobry, and Russell Turco had been working on the PensionManager project. Lyons testified that both were qualified for the project manager position but were not asked if they were interested in the position.

Plaintiff claims that he was given virtually nothing to do in his new position. He complained to several company officials. In late March, 1991, Khair suffered a severe outbreak of psoriasis with associated depression and was out of work for approximately one month.

When he returned to work, he discovered that Miller, at age thirty-one, had been promoted from a level 26 to a level 30. In July of 1991, plaintiff learned that Bill Langford (age 33) and Larry Tursi (age 29) had also been promoted from level 26 to 30. Defendant states that these promotions were instituted because of the employees' increased responsibilities. In January, 1991, Campbell decided to centralize various financial functions at their Camden headquarters. After review, the Human Resources Department upgraded the job levels of these employees as of April 16, 1991, due to the centralization.[4] At the time the centralization became effective, Miller was performing essentially the same functions that Khair had been per-

---

4. Russell Turco (29 years old) and Ray Dobry (30 years old), two managers in the Payroll Services Department, were also promoted in 1991, after their positions were reevaluated by the Human Resources Department and upgraded.

forming when he was transferred on February 1, 1991.

Sometime after plaintiff's return from medical leave in mid-May 1991, plaintiff began to access the Campbell Human Resources Information System ("HRIS") to prepare documents and charts showing certain employees' age, level, years at Campbell, etc. On January 10, 1992, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Without Campbell's permission, Khair provided the EEOC with copies of the documents he prepared by using the HRIS.[5]

On March 11, 1992, plaintiff was given his annual review for 1991 by his supervisor, Jack Lyons. Lyons gave plaintiff an overall rating of "3"[6] on a scale of "1" to "5." Employees with a grade of "3" receive lower pay increases than those with a rating of "4" or "5." Shimrak also signed this evaluation. Lyons avers that he prepared this report on February 7, 1992, before he knew that Khair had filed an EEOC complaint. Plaintiff believes Lyons did know about his EEOC complaint, and plaintiff wrote in the space on the evaluation for employee's comments that "its contents represnt [sic] a continuation to [sic] the discriminatory treatment reported in my complaint to the EEOC." (Pl.Ex. 10.) In his deposition, plaintiff stated that he did not believe Lyons had ever discriminated against him because of his age or national origin.

In early 1992, Campbell decided that it needed a full-time administrator for the PensionManager system. Lyons offered plaintiff the job, and plaintiff accepted.

In October, 1992, plaintiff applied for the opening for Manager–Centralized General Ledger (a level 28 position). This job was similar to his prior position as Manager–Financial Systems Control. Miller was the hiring supervisor for this position. Miller contends that she decided not to hire Khair before she interviewed him because she believed that plaintiff's management style was in conflict with her own. Miller states she found out about Khair's EEOC charge when he told her about the charge during his interview for the general ledger position.

On December 10, 1992, plaintiff learned that the employee selected as Manager–Centralized General Ledger was Nancy Riley. Riley is a native American. Plaintiff claims that Riley was thirty-one when she was promoted;[7] Khair was forty-seven.

In March, 1993, plaintiff received his 1992 annual review in which he received an overall grade of "4" on a scale of "5." Lyons made several negative comments about plaintiff's performance. Khair responded to these complaints in writing.

On April 15, 1993, plaintiff filed a complaint alleging that his transfer and defendant's failure to promote him violated Title VII, § 1981, the ADEA, and the NJLAD. On June 10, 1993, defendant counterclaimed against plaintiff for breaching Campbell's confidentiality policy and for Khair's breach of his duty of loyalty to Campbell. On January 24, 1994, plaintiff filed an amended complaint asserting that his 1991 and 1992 annual reviews and his rejection for the Manager–Centralized General Ledger position amounted to retaliation in violation of Title VII, § 1981, the ADEA and the NJLAD.

## II. *STANDARD FOR SUMMARY JUDGMENT*

Under Fed.R.Civ.P. 56(c), a court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The non-moving party may not simply rest on its pleadings to oppose a summary judgment motion but must affirmatively come forward with admissible evidence establishing a genuine issue of fact. *See*

---

**5.** Defendant alleges that Khair was attempting to build a case that Campbell was engaged in discriminatory employment practices which favored African–Americans.

**6.** The evaluation form is actually marked "3+"; however, this "+" does not appear on computer-generated documents showing plaintiff's performance history, *see* Def.Ex. B, and apparently was not taken into account in determining plaintiff's salary.

**7.** The record does not contain Riley's birth date.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

■■■ In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. American Telephone & Telegraph Long Lines,* 794 F.2d 860, 864 (3d Cir.1986). The role of the court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

■■■ The substantive law governing the dispute will determine which facts are material, and only disputes over those facts "that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. A genuine issue for trial does not exist "unless the party opposing the motion can adduce evidence which, when considered in light of that party's burden of proof at trial, could be the basis for a jury finding in that party's favor." *J.E. Mamiye & Sons, Inc. v. Fidelity Bank,* 813 F.2d 610, 618 (3d Cir.1987) (Becker, J., concurring).

## III. *DISCUSSION*

### A. *Limitations Period—ADEA and Title VII*

■■ Defendant argues that plaintiff's discriminatory transfer claim is time-barred because plaintiff failed to file his claim within the 300 day time limit of the ADEA and Title VII.[8] Campbell contends that plaintiff accepted the transfer in December, 1990. Khair was aware of the transfer on January 10, 1991, when he received his annual performance review. The transfer was announced by memo dated January 24, 1991 and became effective on February 1, 1991. Plaintiff filed

a formal charge with the EEOC on January 10, 1992.

"A claim accrues in a federal cause of action as soon as a potential claimant either is aware, or should be aware, of the existence and source of injury." *Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1385–86 (3d Cir.1994). Whether the relevant date of the injury in this case is December, January or February, if the Court considers plaintiff's transfer as the only allegedly discriminatory conduct, plaintiff's filing date exceeded the 300 day deadline.

Plaintiff argues that his transfer denied him a promotion on April 16, 1991 and that this action is the relevant "source of injury" for accrual date purposes. Plaintiff claims that Campbell knew *before* Khair was transferred that the company's general ledger function was being centralized in Camden and that individuals working on that function would receive pay raises and bonus eligibility because the increased responsibilities would result in a higher job rating. Since Khair, prior to February of 1991, was doing the general ledger work which would be upgraded by the centralization, it would obviously have been perceived as discriminatory to deny him a promotion while promoting others who were also impacted by the centralization.

Khair alleges that to avoid the risk of exposing discriminatory animus, Campbell decided to transfer him to a job which would not be upgraded when centralization was implemented. Thus the transfer was merely a pretext for not promoting Khair, and the plaintiff argues that we should consider Khair's discriminatory transfer claim in conjunction with the denied promotion as a single cause of action. If the facts support this inference, the accrual date would be the date that the plaintiff discovered the April 16, 1991 promotion of Miller.[9]

---

**8.** *See* 42 U.S.C. § 2000e–5(e) (Title VII); 29 U.S.C. § 626(d)(2) (ADEA). The New Jersey Division of Civil Rights and the EEOC have a worksharing agreement in which each agency has designated the other as its agent for receiving complaints. Rosemary Alito, *New Jersey Employment Law* § 106.6, at 245–46 (1992). Because of this worksharing agreement, plaintiff

had 300 days to file his charge with the EEOC. *See Brennan v. Nat'l Telephone Directory Corp.,* 850 F.Supp. 331, 338 (E.D.Pa.1994) (Title VII); 29 C.F.R. § 1626.10(c) (ADEA).

**9.** Courts are well aware that corporate reorganizations and personnel transfers can be used as a cover to conceal discriminatory animus. *See*

Considering the facts in the light most favorable to the plaintiff, a reasonable jury could infer such a plot. According to the plaintiff, his troubles with Shimrak began as early as June and July of 1988. Shimrak added to Khair's responsibilities without promoting him in early 1989 while he promoted other employees. Then in August of 1990, Shimrak transferred some of Khair's duties to Yecco. Khair complained about these changes. In addition, Shimrak had been referring to Khair as his "Egyptian friend" and expressing his disapproval of American efforts in the Persian Gulf War. A factfinder could conclude that Shimrak did not want Khair to benefit from the planned centralization of the Campbell general ledger function in Camden.

It appears that early on someone at Campbell did want Sherry Miller to benefit from the centralization. As of January 24, 1991—before Khair's transfer was even effective—there was a PIQ for Sherry Miller that promoted her to a job level of 30. It is noteworthy that Miller's promotion did not take effect until April 16, 1991, the date on which the Human Resources Department upgraded her job (formerly Khair's job) due to centralization. At this stage in the litigation this time sequence permits an inference that (i) Campbell knew before Khair's transfer that his job would be upgraded and (ii) the transfer was motivated by a desire to avoid giving him the benefit of that upgrade.

Plaintiff claims in his complaint that both he and Shimrak knew about the possibility of centralization at the time of his transfer.[10] Campbell insists that its decision to centralize was not made until January, 1991 and that Shimrak was not sent a memo regarding this decision until February 8, 1991—long after the decision was made to transfer

Khair. In their supplemental answers to interrogatories, Campbell asserts that "[p]rior to the decision to consolidate these certain accounting functions, Campbell was planning to place additional responsibility for these functions on the plants, rather than in the Camden headquarters. Campbell had worked for over a year on this plan." (Pl.Ex. 25.) Senior Corporate Counsel for Campbell stated that planning is required for projects such as the centralization project, (Metz Dep. at 24–25), and the Court believes that the current record supports an inference that such planning preceded Khair's transfer, especially since the consolidation decision reversed the plans that Campbell had been working on for more than a year.

An inference unfavorable to the defendant also arises from Khair's transfer to Manager–Payroll Services on February 1, 1991, more than two months before corporate approval of the PensionManager project on April 3. There was no funding and no full-time work for him at Payroll Services; Khair still had the responsibility to close Campbell's books for the quarter ending January 1991, (Yecco Dep. at 139–142); and, in fact, he worked on this project for two weeks in February after his transfer became effective.

February 13, 1991, was the first meeting to discuss centralization. Khair was obviously knowledgeable about the general ledger function, and even though he had been transferred shortly before the meeting, one might have expected his participation at this meeting. In fact, Khair was listed as invited to this meeting, (Pl.Ex. 25), yet he never received the memo asking him to participate.

Plaintiff's transfer to the PensionManager project was not, standing alone, an obvious demotion or adverse employment decision.

*Armbruster v. Unisys Corp.*, 32 F.3d 768 (3d Cir. 1994) (inference of age discrimination supported by transfer of older employees to a new group which was subsequently terminated); *Torre v. Casio, Inc.*, 42 F.3d 825, 827 (3d Cir.1994) (evidence supports allegation that plaintiff was transferred as a subterfuge "from which he could be fired at a more propitious—and seemingly innocent—moment.").

10. Campbell claims that this admission requires the Court to use the transfer date as the accrual date since that was when Khair knew he would

not be promoted. Khair did not know that he could not be promoted because he was installing the PensionManager project; on the contrary, Khair believed that the PensionManager project was temporary. He was not asked to be the full-time administrator of the project until early 1992. We have no reason to believe that Khair could not have been returned to a position involving the general ledger after he completed the PensionManager installation and then be promoted.

There was no pay cut, and Campbell told plaintiff then, and tells the Court now, that its motivation was to further Khair's career. If Campbell asks us to believe that this decision was in no way intended to hurt the plaintiff, it can hardly also urge that Khair should have known in January of 1991 that the transfer was an adverse employment decision.

Although Khair was unhappy with the transfer, he was not actually injured until Miller's April 16, 1991 promotion. *See Whittle v. Local 641,* No. 94–5334, 1995 U.S.App. LEXIS 12532, 56 F.3d 487 (3d Cir., 1995) (on a duty of fair representation claim, employees could not know they had suffered any loss until they learned they lost the arbitration). Up to that date, Campbell could have transferred plaintiff back to his old position where he would have benefitted from the centralization. On the record before us, a finder of fact could conclude that the transfer to the PensionManager position was a carefully concealed first step to deprive Khair of the promotion he would have received in April when centralization was implemented. It was only when Miller received her promotion that the subterfuge was exposed. *See supra* note 9.

Khair was on medical leave from March 26, 1991 through April 29, 1991. (Pl.Ex. 14.) Thus, the earliest Khair could have learned of this promotion was when he returned from medical leave. Since he filed his EEOC complaint on January 10, 1992, his complaint is within the 300 day filing requirement and is not time-barred.

### B. *Limitations Period—§ 1981*

The parties agree that the statute of limitations for plaintiff's § 1981 claim is two years. *See Goodman v. Lukens Steel Co.,* 482 U.S. 656, 660–62, 107 S.Ct. 2617, 2620–21, 96 L.Ed.2d 572 (1987) and N.J.S.A. 2A:14–2. Since plaintiff filed his complaint on April 15, 1993—less than two years after his return from medical leave at the end of April, 1991—Khair has met the statute of limitations.

### C. *Limitations Period—NJLAD*

The NJLAD does not specify a statute of limitations. Plaintiff believes the Court should apply the six-year limitations period under N.J.S.A. 2A:14–1, which covers "tortious injury to the rights of another." Defendant urges us to apply the two-year limitations period of N.J.S.A. 2A:14–2, covering "injury to the person." Since plaintiff filed within two years of the date that the source of injury was known to him, under either statute plaintiff's claim under the NJLAD is timely.

### D. *Cognizability of § 1981 Claims*

■ Even though plaintiff's discriminatory transfer/failure to promote claim has been timely filed, it is not actionable under § 1981.[11] Both parties agree that *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), not the Civil Rights Act of 1991, applies to plaintiff's retaliatory transfer/failure to promote claim since the Civil Rights Act of 1991 applies only to claims arising after November 21, 1991. *Rivers v. Roadway Express Inc.,* —— U.S. ——, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994). *Patterson* held that § 1981 prohibits racial discrimination in the formation and the enforcement of contracts. 491 U.S. at 176. Specifically, § 1981 prohibits the refusal to enter into a contract with someone based on race "as well as the offer to make a contract only on discriminatory terms," 491 U.S. at 177–78, 109 S.Ct. at 2372, and discrimination that "infects the legal process in ways that prevent one from enforcing contracts," 491 U.S. at 178, 109 S.Ct. at 2373. Because promotions are similar to the formation of new contracts, failure to promote claims that deny the employee a "new and distinct relation" with her employer may also be brought

---

**11.** Section 1981(a) provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

pursuant to § 1981. *Id.* at 185, 109 S.Ct. at 2377.

▇▇▇ Plaintiff argues that his claim that he should have been promoted in April, 1991, instead of Sherry Miller, falls within *Patterson*'s scope. For purposes of § 1981, a new and distinct relationship is created by a promotion when "the terms of the contract as to duties, tenure, compensation or essential function" would change with the promotion. *Bennun v. Rutgers State University*, 941 F.2d 154, 169 (3d Cir.1991), *cert. denied*, 502 U.S. 1066, 112 S.Ct. 956, 117 L.Ed.2d 124 (1992). Examples of valid § 1981 claims include changing from a non-supervisory to a supervisory position, *id.* at 169, and moving from hourly compensation to a salary, *Sitgraves v. Allied–Signal, Inc.*, 953 F.2d 570, 574 (9th Cir.1992).

Defendant does not challenge plaintiff's representation that Miller's PIQ involved similar responsibilities to those plaintiff had before his transfer.[12] While Khair's duties, essential function, and tenure might not have changed, plaintiff insists that a level 30 designation not only involves a higher salary and bonus-eligibility, but it also confers a different stature on that employee. Elements such as prestige and public perception were discounted by *Bennun*, which held that promotion from tenured associate professor to tenured full professor was insufficient for a § 1981 claim.

Plaintiff also directed us to *Harper v. Godfrey Co.*, 45 F.3d 143 (7th Cir.1995). *Harper* involved a strike in which replacement workers were utilized. After the strike, a hierarchy was created in which the striking workers resumed as regular full-time employees and the replacement workers became "casuals" or part-time workers. The Seventh Circuit held that because the elevation from casual to regular employee provided "increased job security, seniority rights, better salary, and more fringe benefits," there were "disputed material issues of fact that require[d] submission to a jury." *Id.* at 147. This Court agrees with *Harper* but finds the instant case not analogous. Here the only difference beyond prestige is salary, and an increase in pay does not reach the level of change required by *Patterson*. *Taylor v. Western and Southern Life Insurance Co.*, 966 F.2d 1188, 1200 (7th Cir.1992) (quoting *Harrison v. Associates Corp. of North America*, 917 F.2d 195, 198 (5th Cir.1990)). Plaintiff's discriminatory transfer/failure to promote claim under § 1981 is dismissed.

▇▇▇ Plaintiff's two remaining § 1981 claims, the failure to promote claim for his rejection in late 1992 for the position of Manager–Centralized General Ledger and the retaliation claims, are viable under § 1981 since they arose after the enactment of the Civil Rights Act on November 21, 1991. *See* Lex K. Larson, *Employment Discrimination* § T88A.14, at 1570 (2d ed. 1995) (§ 1981 "extends to the same broad range of employment actions and conditions as in the case of Title VII."). Defendant moves for summary judgment on these claims because Campbell asserts that plaintiff only alleges national origin discrimination, not race discrimination.

In *Saint Francis College v. Al–Khazraji*, 481 U.S. 604, 613, 107 S.Ct. 2022, 2028, 95 L.Ed.2d 582 (1987), the Supreme Court held that a claim was cognizable under § 1981 if a plaintiff could show that she was subjected to intentional discrimination solely because of her ancestry or ethnic origin, rather than solely because of the place or nation of her origin. The respondent in *Al–Khazraji* was a United States citizen born in Iraq. Because Arabs are Caucasians, the petitioners in *Al–Khazraji* contended that § 1981 did not encompass claims of discrimination by one Caucasian against another. The Court rejected this argument since Arabs were not considered Caucasians when § 1981 was enacted in 1870.

Thus the Supreme Court refused to narrowly define the concept of race. Several Circuit Courts of Appeal have likewise noted that it is difficult to draw a bright line between national origin discrimination and racial discrimination. *Daemi v. Church's Fried Chicken, Inc.*, 931 F.2d 1379, 1387 n. 7 (10th Cir.1991) (the concept of race extends to

---

**12.** Although the number of transactions increased due to the consolidation, the essential function of the job, administering the general ledger, did not change.

matter of ancestry); *Alizadeh v. Safeway Stores, Inc.,* 802 F.2d 111, 114–15 (5th Cir. 1986) (even though Caucasian, Iranians protected under § 1981); *Hussein v. Oshkosh Motor Truck Co.,* 816 F.2d 348, 352 (7th Cir.1987) (§ 1981 claim viable when plaintiff alleges he belongs to a group distinct from white citizens).

Khair asserts that Shimrak has made unnecessary and disdainful references to his Egyptian heritage such as Shimrak's remarks regarding camels and Egyptian curses. In *Hussein,* the Seventh Circuit reinstated a § 1981 claim where the plaintiff had alleged that his supervisors and co-employees had called him a "dirty Black" and a "camel jockey." 816 F.2d at 352 n. 3. Thus the Seventh Circuit found that if Hussein had been discriminated against, § 1981 could be the basis for that claim. We hold that if a jury found that Khair was the victim of discriminatory animus, that jury could also find that the source of the defendant's discriminatory animus was plaintiff's ancestry or ethnic origin, rather than his place of birth.

### E. *Exclusive Remedy of Workers' Compensation*

■ Defendant argues that the tort bar of the Worker's Compensation Act ("WCA") prohibits plaintiff's personal injury claims under the NJLAD. This argument is directed at plaintiff's supplemental state law claims, and thus the Court must examine the law of the state of New Jersey.

The exclusive remedy provision of the WCA states:

If an injury or death is compensable under this article, a person shall not be liable to anyone at common law or otherwise on account of such injury or death for any act or omission occurring while such person was in the same employ as the person injured or killed, *except for intentional wrong.*

N.J.S.A. 34:15–8 (emphasis added). In *Millison v. E.I. du Pont de Nemours & Co.,* the New Jersey Supreme Court considered whether the exclusive remedy provision of the WCA precluded a separate tort action against the employer and the employer's physicians by employees who had suffered occupational diseases. 101 N.J. 161, 501 A.2d 505 (1985). After a lengthy discussion of the legislative history and subsequent development of the WCA, *Millison* determined that in order to constitute an intentional wrong, the level of risk exposure must be substantially certain. *Id.* at 179, 501 A.2d at 514. Furthermore, in determining what conduct rises to the level of actual intentional wrongs, *Millison* directed courts to

examine not only the conduct of the employer, but also the context in which that conduct takes place: may the resulting injury or disease, and the circumstances in which it is inflicted on the worker, fairly be viewed as a fact of life of industrial employment, or is it rather plainly beyond anything the legislature could have contemplated as entitling the employee to recover *only* under the Compensation Act?

*Id.* (emphasis in original).[13]

Neither the Court nor the parties have found any New Jersey state cases directly on point. However, in 1988, Chief Judge Gerry held that under the principles of *Millison,* sexual harassment constituted an intentional wrong, and thus the plaintiff's injuries were beyond the intended scope of the drafters of the WCA. *Cremen v. Harrah's Marina Hotel Casino,* 680 F.Supp. 150, 159 (D.N.J. 1988). Judge Gerry held that the alleged harassment was substantially certain to cause plaintiff harm and could not be accepted as "a fact of life of industrial employment." *Id.* at 158 (citing *Millison,* 101 N.J. at 179, 501 A.2d at 514). Likewise, this Court finds that the alleged discriminatory conduct of Campbell was substantially certain to injure the plaintiff. Moreover, we

---

13. *Millison* allows both a WCA claim and a claim under the intentional wrong exception. 101 N.J. at 187, 501 A.2d at 519. Khair's claim for WCA benefits was denied by the carrier which concluded that his ailments did not arise out of his employment. It is not clear from the record if plaintiff actually petitioned the workers' compensation court. Defendant has not argued that plaintiff is collaterally estopped from seeking damages for the same ailments in this case, but under *Imre v. Riegel Paper Corp.,* 24 N.J. 438, 450, 132 A.2d 505 (1957), this argument would probably fail.

refuse to believe that the New Jersey Supreme Court or state legislature would find race or national origin discrimination to be an unfortunate but expected consequence of employment. *See also Chavira v. Payless Shoe Source,* 140 F.R.D. 441, 446 (E.D.Cal. 1991) (discrimination, being against the law and policy of California, is not a normal incident to employment, and thus worker's compensation bar does not apply); *Barba v. BPS Guard Services,* No. 90–1903c(2), 1992 WL 406540, 1992 U.S. Dist. LEXIS 20470 (E.D.Mo. Feb. 29, 1992) (in gender discrimination case, damages compensable under Missouri Human Rights Act not preempted by Missouri's Worker's Compensation Act).

Defendant contends that plaintiff must show not only that Shimrak intended to injure Khair but also that Shimrak intended to cause Khair's specific injuries of depression and psoriasis. Defendant cites *Millison* and *Bustamante v. Tuliano,* 248 N.J.Super. 492, 591 A.2d 694 (App.Div.1991), *cert. denied,* 126 N.J. 385, 599 A.2d 162 (1991) as the basis for this argument. The Court can find no support for this argument in either case. These cases require proof of substantial certainty of the intent to injure, not proof of the intent to cause a specific injury. We see no reason to deviate from the black letter law of intentional torts in which an actor may be liable for unintended injury when the tortious conduct was intended. *See, e.g.,* Restatement (Second) of Torts § 8A cmt. b (1965).[14]

### F. Substance of Discrimination Claims

1. Discriminatory Transfer/Failure to Promote Claim under Title VII, the ADEA and the NJLAD

▪ The analysis of a pretext claim under the ADEA and the NJLAD is similar to that under Title VII. *See Armbruster,* 32 F.3d at 777 n. 10, 782 (Title VII analysis applies to ADEA); *Abrams v. Lightolier Inc.,* 50 F.3d 1204, 1212 (3d Cir.1995) ("New Jersey courts in applying the NJLAD gener-

ally follow the standards of proof applicable under the federal discrimination statutes[.]").

▪ Khair claims disparate treatment under the pretext theory announced in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1983). Accordingly, the Court must apply the three-step burden shifting analysis first set forth in *McDonnell Douglas,* 411 U.S. at 802–805, 93 S.Ct. at 1824–26. First, plaintiff must come forward with sufficient evidence to establish a prima facie case of discrimination. If plaintiff succeeds in establishing a prima facie case, the burden then shifts to the defendant, who must articulate some legitimate, non-discriminatory reason for the employee's transfer. Finally, if defendant is able to meet this burden, plaintiff must be given the opportunity to present evidence sufficient to show that the legitimate reasons offered by the defendant should not be believed *and* that discrimination was "the real reason" for the adverse employment action. *St. Mary's Honor Ctr. v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2752, 125 L.Ed.2d 407 (1993); *see also Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981).

▪ Defendant claims that plaintiff has failed to establish a prima facie case of discrimination since he never applied for the promotion given to Sherry Miller in April of 1991. Although some courts have held that failure to apply for a promotion is fatal to a failure to promote claim, many courts have overlooked this failure in certain cases, such as when the promotional system did not involve a formal application process and when a plaintiff's attempts to apply for a promotion have been rebuffed. Larson, *Employment Discrimination* § 8.02[2], at 8–25 to 27. For example, the Third Circuit, in a failure to hire case, reversed a trial court which had held that the EEOC had not made out a prima facie case because there was insufficient evidence to show that the plaintiffs had actually applied for a job. *EEOC v. Metal*

---

**14.** The New Jersey legislature passed the WCA in 1911 and the NJLAD in 1945. Plaintiff argues that the New Jersey legislature would have explicitly carved out a worker's compensation exception if the legislature had believed the WCA

preempted the NJLAD. While plaintiff has not pointed to any legislative history which would suggest that such omission was intentional, there is some logical appeal to this argument.

*Service Co.,* 892 F.2d 341 (3d Cir.1990). The Third Circuit found that the plaintiffs "did everything reasonably possible to make known to Metal Service their interest in applying for a job." *Id.* at 349.

In the instant case, there was no formal application process for the promotions at issue. Second, plaintiff had spoken to various people at Campbell about dissatisfaction with his career opportunities [15]—both before his move to the PensionManager position and after the move. The Supreme Court has "cautioned that the 'facts necessarily will vary in Title VII cases, and the specification ... of the prima facie proof required from [the complainant] is not necessarily applicable in every respect to differing factual situations.' " *Id.* at 347 (quoting *McDonnell Douglas,* 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13). "[A] Title VII plaintiff has established a prima facie case when sufficient evidence is offered such that the court can infer that if the employer's actions remain unexplained, it is more likely than not that such actions were based on impermissible reasons." *Id.* at 348. Plaintiff's allegations of the scheme outlined in part III.A., *supra,* are more than sufficient to meet the "not onerous" burden of proof required for a prima facie case. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1094. Indeed, it seems clear from the record that the promotions of Miller, Tursi, and Langford realistically resulted not from formal applications but rather from the consolidation of Campbell's general ledger function in Camden.

■■■ The next prong of the *McDonnell Douglas* analysis shifts the burden of production to Campbell to articulate a legitimate, non-discriminatory reason for Khair's transfer. The defendant's burden is not one of persuasion but only of production of evidence logically supporting a reason for the adverse employment decision. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1094; *Bellissimo v. Westinghouse Elec. Corp.,* 764 F.2d 175, 179 (3d Cir.1985), *cert. denied,* 475 U.S. 1035, 106 S.Ct. 1244, 89 L.Ed.2d 353 (1986). Campbell claims it transferred Khair because Campbell

needed a project manager for the installation of the PensionManager system. Moreover, Shimrak asserts that he believed that the plaintiff was qualified for this position [16] and that the transfer would provide Khair with an opportunity to broaden his level of experience at Campbell. These are logical, non-discriminatory reasons for plaintiff's transfer. We therefore find that the defendant has met its burden of production.

■■■ Where plaintiff establishes a prima facie case and the defendant proffers a legitimate, non-discriminatory reason for the employment decision, the plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir.1994) (citations omitted).

■■■ In addressing the quantum of evidence necessary to avoid summary judgment, the Third Circuit stated that the plaintiff's evidence "must allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons ... was either a *post hoc* fabrication or otherwise did not actually motivate the employment action[.]" *Id.* (internal citations omitted) (emphasis in original). Furthermore, the question is not whether the employer's action was wise or prudent. "Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence'[.]" *Id.* at 765 (quoting *Ezold v. Wolf, Block, Schorr and Solis-Cohen,* 983 F.2d 509, 531 (3d Cir.1992), *cert. denied,* —— U.S. ——, 114 S.Ct. 88, 126 L.Ed.2d 56 (1993)).

■■■ To support his race/national origin discrimination claim plaintiff alleges that his

---

**15.** In fact, Khair's dissatisfaction was Shimrak's justification for moving him to the PensionManager position.

**16.** Plaintiff does not dispute that he was qualified for this position.

supervisor, John Shimrak, made several derogatory comments about his Egyptian heritage. Defendant argues (1) that these are stray remarks and (2) that references to plaintiff's national origin are not evidence of discriminatory animus. While such comments may be dismissed as "stray remarks" when they are made by non-decisionmakers or are made temporally remote from the date of decision, we believe that it would be erroneous to dismiss them here since Shimrak was a decisionmaker and at least one comment was contemporaneous with Khair's transfer. *See Armbruster*, 32 F.3d at 783. Whether or not Shimrak's remarks are discriminatory or innocuous is a disputed fact that we must allow a jury to decide.

 Plaintiff also argues that he was transferred to a non-existent, unnecessary, and temporary job that ultimately curtailed his promotional opportunities. Campbell does not argue that Khair's transfer benefitted his career. Rather, the defendant maintains that the relevant decisionmakers who created the Manager–Payroll Services position believed it was necessary and that its funding would be available. Plaintiff, however, notes that (i) the Pension Administration Committee decided in December of 1990 to deny funding to the PensionManager program; (ii) the PensionManager project did not get formal approval until two months after plaintiff's transfer; (iii) Shimrak's December 14, 1990, memo stated that new staff would be used for installation, but that after installation, his goal was to use the staff that had existed before installation; and (iv) the position of Manager–Payroll Services was never submitted for corporate approval, it had no PIQ, and it never showed up on plaintiff's change of status form. In short, plaintiff has presented evidence from which a rational factfinder could conclude that his transfer effective February 1, 1991, was a subterfuge to deprive him of the promotions which Campbell knew would flow from centralization of the general ledger function. *See* discussion at part III.A., *supra.*[17]

These facts are not unlike the facts in *Torre* in which Casio, Inc. was accused of transferring and ultimately firing Torre because of his age. 42 F.3d 825. One supervisor involved was accused of leaving a message on Torre's answering machine asking for a report and saying "did you forget or are you getting too old, you senile bastard?" 42 F.3d at 834. In addition, Torre was transferred to a job very similar to a job that had been phased out two months before Torre's transfer. *Id.* at 835. Casio argued that Torre was lazy and unwilling to travel, and so they transferred Torre to a new job that involved less travel time. *Id.* at 828. The Third Circuit reversed the district court's decision to grant Casio's motion for summary judgment and found that a jury could reasonably conclude that instead of trying to help Torre, Casio was attempting to warehouse him or to set him up for termination. We believe that a jury could look at the facts of the instant case and reach the conclusion that Campbell's proffered reasons for his transfer are a pretext for race/national origin discrimination.

 We now turn to plaintiff's age discrimination claim. Except for the lack of an application, defendant does not dispute Khair's ability to establish a prima facie case. Nor does plaintiff argue that Campbell has no legitimate business justification for its actions.

 Under *Fuentes*, plaintiff must have evidence showing either that Campbell's proffered business justification for transferring Khair was pretextual or that Campbell's real motivation was age discrimination. In examining plaintiff's national origin/race discrimination claim, we found that plaintiff had evidence both that defendant's articulated business justification was pretextual *and* that the real motivation was national origin/race discrimination. As to the ADEA claim, plaintiff can prove pretext with exactly the same evidence used to establish pretext on the race/national origin claim. However, he lacks any evidence (beyond the prima facie

---

17. Because the plaintiff's theory involves corporate subterfuge, proving a prima facie case is somewhat complicated. *See Metal Service Co.*, 892 F.2d at 347. Plaintiff's use of the same evidence to support both his prima facie case and pretext is proper. *Burdine*, 450 U.S. at 255 n. 10, 101 S.Ct. at 1095 n. 10; *see also Fuentes*, 32 F.3d at 764.

case itself) that age was a motivating factor behind the adverse employment decisions.[18] Indeed, there may even be some proof that age was not a motivating factor.[19]

Although Khair's ADEA claim might fail in jurisdictions which have adopted the so-called pretext-plus standard, i.e., requiring proof of both pretext *and* discriminatory animus to defeat a motion under Fed.R.Civ.P. 56, the Third Circuit has made clear in *Fuentes* and *Waldron v. SL Industries, Inc.,* 56 F.3d 491 at 494–95 (3d Cir.1995), *rev'g,* 849 F.Supp. 996 (D.N.J.1994) (see footnote 11), that proof of pretext or discriminatory animus is sufficient to defeat summary judgment. Therefore, summary judgment on the ADEA claim is denied.

### 2. Plaintiff's 1992 Failure to Promote Claim Under the ADEA, Title VII, § 1981,[20] and the NJLAD

■ Again, defendant does not contest plaintiff's ability to make out a prima facie case in his 1992 failure to promote claim. Campbell's legitimate business justification for not promoting Khair to Manager–Centralized General Ledger in late 1992 was that Sherry Miller, the hiring supervisor for the position, believed that Khair's management style conflicted with her own. Khair maintains that he was not promoted both because of discrimination and because he was retaliated against for filing his EEOC charge.

Once again we must determine whether plaintiff has presented evidence to show that the defendant's legitimate, non-discriminatory reason is false or is a pretext for discrimination. *Fuentes,* 32 F.3d at 764. The documents and the deposition testimony indicate that Sherry Miller used a grid to rate applicants' performance in different areas on a scale of 1 to 5. When the scores were averaged, plaintiff received a score of 3.88, the second highest rank after Nancy Riley who received a score of 4.25 and who was ultimately chosen for the position. The grid also included a space for comments. *See* Pl.Ex. 36. In that space, Miller has written about Khair: "His managereal [sic] style does not permit staff members to seek opportunities to develop. Style Conflict . . ." Miller also indicated in a space on the grid whether or not she wanted to give the applicant a second interview. For Khair, she wrote "No." Miller also testified that before she interviewed the plaintiff, she did not know that he had filed a charge with the EEOC. Finally, Miller stated that she only interviewed Khair as a courtesy even though she had already previously decided not to select Khair for the position.

As evidence of discriminatory animus, the plaintiff argues that he should have been interviewed by Shimrak, Miller's supervisor, since Shimrak told Miller that he wanted to interview the top three candidates. Furthermore, Khair had more experience on the general ledger than any other candidate.

Plaintiff wants the Court to infer that Shimrak influenced Miller's decision not to select Khair because Shimrak knew of plaintiff's EEOC charge or had discriminated against him in the past. The Court is supposed to draw this conclusion because Shimrak did not interview Khair when he had told Miller he wanted to interview the top three candidates. The plaintiff would have us conclude that Shimrak chose not to interview

---

18. Plaintiff avers that Shimrak promoted five younger, less qualified employees. This is not a statistically significant sample to show bias. *See Mayor of Philadelphia v. Educational Equality League,* 415 U.S. 605, 621, 94 S.Ct. 1323, 1333, 39 L.Ed.2d 630 (1974) (approving of district court's concern for smallness of sample size of thirteen); *see also Simpson v. Midland–Ross Corp.,* 823 F.2d 937, 943 n. 7 (6th Cir.1987) ("[S]mall statistical samples provide little or no probative force to show discrimination.")

19. During the time period at issue, Shimrak has promoted at least one older individual, Fran Stronski, who is five years older than the plain-

tiff. Shimrak himself is older than plaintiff. Moreover, plaintiff never even claimed age discrimination—before he was represented by an attorney—when he first presented claims to the EEOC on November 12, 1991. (Prior to filing his formal charge on January 10, 1992, Khair submitted an Intake Questionnaire and two other documents to the EEOC on November 12, 1991.)

20. Section 1981 requires the same elements of proof as a Title VII action. *Lewis v. Univ. of Pittsburgh,* 725 F.2d 910, 915 n. 5 (3d Cir.1983), *cert. denied,* 469 U.S. 892, 105 S.Ct. 266, 83 L.Ed.2d 202 (1984).

him despite Khair's rank and that this affected Miller's decision.

Plaintiff confuses having one of the three highest numerical scores with being one of the three top candidates. Plaintiff has produced no evidence that Miller ever considered plaintiff one of the three top candidates or that she did not choose Khair for the reason she has given—that she did not approve of his management style. Because plaintiff fails to present evidence of pretext or discriminatory animus in defendant's decision not to promote plaintiff in 1992 to Manager–Centralized General Ledger, summary judgment in favor of the defendant is granted.

### 3. Plaintiff's Retaliation Claims Under Title VII, the ADEA, § 1981 and the NJLAD

■ Title VII, the ADEA, and the NJLAD all prohibit an employer from taking retaliatory action against an employee for complaining that the employer has violated that antidiscrimination statute. 42 U.S.C. § 2000e–3(a) (Title VII); 29 U.S.C. § 623(d) (ADEA); N.J.S.A. 10:5–12d (NJLAD). The Civil Rights Act of 1991 extended § 1981 to the reaches of Title VII. *See* Larson, *Employment Discrimination* § T88A.14, at 1570. The shifting burdens of proof of *McDonnell Douglas* apply to retaliation claims. *Griffiths v. CIGNA Corp.*, 988 F.2d 457, 468 (3d Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 186, 126 L.Ed.2d 145 (1993); *Cuffy v. Texaco Refining & Marketing Co.*, 684 F.Supp. 87, 94 (D.Del.1988).

■ To establish a prima facie case of retaliation, plaintiff must prove: (1) that he was engaged in a protected activity, (2) that he suffered an adverse employment decision, and (3) that there was a causal connection between the protected activity and the adverse employment decision. *Nelson v. Upsala College*, 51 F.3d 383, 386 (3d Cir.1995); *Charlton v. Paramus Board of Ed.*, 25 F.3d 194, 196–97 (3d Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 590, 130 L.Ed.2d 503 (1994). There is no dispute that the plaintiff engaged in protected activity when he filed discrimination charges with the EEOC. Plaintiff complains that he received less favorable performance evaluations for 1991[21] and 1992 and that he was not promoted to Manager–Centralized General Ledger because he filed an EEOC charge in January, 1992. We shall consider each alleged adverse employment action in chronological order.

■ Khair received his 1991 annual review in March, 1992, in which he received his lowest overall performance rating of "3." A rating of "3" meant that plaintiff received a lower pay increase than if he had been rated a "4" or a "5." Thus plaintiff has shown that he suffered an adverse employment action, the second prong of his prima facie case.

■ As to the third prong, a causal link exists only if the alleged retaliator knew of the employee's protected activity. *Cuffy*, 684 F.Supp. at 95, *Jamison v. Rockaway Township Board of Ed.*, 242 N.J.Super. 436, 447, 577 A.2d 177 (App.Div.1990). Lyons claims that he did not know that Khair had filed a charge with the EEOC prior to preparing plaintiff's performance review on February 7, 1992 or prior to giving him his review on March 11, 1992. Plaintiff attempts to dispute this claim by providing an affidavit that states that Lyons did know of Khair's EEOC charge. Khair's basis for this claim is that when Khair received his performance review, he complained later in writing that the review was retaliatory, and Lyons did not respond to this charge.[22] We do not believe

---

21. Plaintiff's retaliation claims were filed with the EEOC on April 19, 1993, more than 300 days after the 1991 annual review was presented to the plaintiff on March 11, 1992. Since the statute of limitations has run on plaintiff's ADEA and Title VII action, plaintiff can proceed only under the NJLAD and § 1981 on this claim. *See supra* part III.A.

22. Khair also complains that the review was late and that Lyons should have discussed the review with him according to company policy and procedure. There is nothing in the record that shows that Campbell had a formal policy regarding the timing of annual reviews. Lyons claims that he "just hadn't gotten around to doing it." Lyons Dep. at 278. He also noted that the timing of one's annual review does not affect the timing of a person's salary increase and that Khair was on medical leave for part of February, 1992. The record shows that Khair was on medical leave from February 10, 1992 through March 6, 1992.

that a superior's failure to rebut a charge made by an employee can be construed as an admission of the truth of the charge, particularly when the charge is delivered impersonally in writing and not in a face to face confrontation. A holding to the contrary would encourage a blizzard of paper in the hope that evidence could be manufactured by someone's failure to rebut a charge of discrimination or retaliation.

Plaintiff also tries to infer Lyons' knowledge from Shimrak's signature approving the evaluation. However, Shimrak's personal knowledge is not Lyons' personal knowledge.

█ Nevertheless, the causation element of a prima facie case of retaliation can be established when a negative employment action takes place in close proximity to protected conduct by the plaintiff. *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir.1989), *cert. denied*, 493 U.S. 1023, 110 S.Ct. 725, 107 L.Ed.2d 745 (1990); *Cuffy*, 684 F.Supp. at 95. Lyons prepared plaintiff's performance review on February 7, 1992—a month after plaintiff filed charges with the EEOC on January 10, 1992. Therefore we shall find that plaintiff has met the requirements of a prima facie case of retaliation.

█ Summary judgment is still warranted, however. If we assume that a legitimate, non-discriminatory reason for plaintiff's negative review were offered,[23] to defeat summary judgment plaintiff would have to produce evidence so that a reasonable factfinder could assume that retaliation was the true motivation for plaintiff's lowered performance rating. *See Colgan v. Fisher Scientific Co.*, 935 F.2d 1407, 1422 (3d Cir.), *cert. denied*, 502 U.S. 941, 112 S.Ct. 379, 116 L.Ed.2d 330 (1991). At his deposition, plaintiff stated that he did not believe that Lyons had discriminated against him on account of his age or national origin. (Khair Dep. at 159.) Thus the only evidence plaintiff has of retaliatory conduct is the 1991 performance review written by Lyons. A poor evaluation following good evaluations, standing alone, cannot give rise to an inference of retaliation.

*Id.* at 1423; *see also Jalil*, 873 F.2d at 709 (timing of termination *and* evidence of harassment sufficient to deny summary judgment).

Next we examine the plaintiff's allegation that his rejection for a promotion was retaliatory. Miller alleges that the first she learned of the plaintiff's charge was during her interview with the plaintiff, but she had decided not to hire Khair prior to the interview. Miller says she told Shimrak that she interviewed the plaintiff only as a courtesy, but Shimrak claims that Miller never told him this. Even if we assume that Miller knew of plaintiff's charge before she made her decision, and plaintiff therefore has succeeded in establishing his prima facie case, plaintiff presents no evidence that Miller took this charge into account when she decided not to hire Khair. Thus a jury would have no basis for concluding that retaliation motivated Miller's decision. Defendant's motion for summary judgment on the retaliation claim based on the failure to promote Khair in 1992 is granted.

Finally we examine plaintiff's claim that his 1992 review, which was written by Lyons and which plaintiff received in March, 1993, was retaliatory. The causation requirement is met since Lyons knew of plaintiff's EEOC charge. Defendant argues that plaintiff has no prima facie case of retaliation since the 1992 review is not an adverse employment decision. Plaintiff received a "4" rating, the second highest rating possible, and plaintiff had never achieved the highest rank in his entire tenure at Campbell. Furthermore, this rating did not result in any reduction in pay. Plaintiff counters that the 1992 review made several, highly critical remarks that were unfounded. This dispute is of no moment. Even if the Court considered the review an adverse employment action—thus establishing all three elements of a prima facie case—plaintiff fails to present any evidence that Khair's EEOC charge, filed January 10, 1992, was the likely reason for his negative review. The EEOC charge was filed more than a year before plaintiff re-

---

**23.** Campbell does not produce such a reason but instead relies on its argument that plaintiff can-

not establish a prima facie case.

ceived his review in March, 1993. Second, plaintiff does not believe that Lyons had discriminated against him. We also note that Lyons' criticisms of the plaintiff were similar to Miller's. Summary judgment is granted.

### G. Campbell's Counterclaim

■ Defendant argues in favor of summary judgment on its counterclaim that alleges that Khair breached company policy and his duty of loyalty to Campbell by accessing confidential personnel information and providing that information to the EEOC. Plaintiff did sign a company policy statement which forbade "[u]nauthorized use or disclosure of systems, software or data." (Def.Ex. Q.) The policy statement warned that violation of this policy could lead to disciplinary action, including dismissal, as well as legal action.

A review of the record suggests factual disputes which preclude the entry of a summary judgment establishing plaintiff's liability on the counterclaim. There is no indication that Campbell ever terminated Khair or meted out a lesser discipline for his alleged transgression. Moreover, there is a serious issue as to whether under New Jersey law a confidentiality agreement or common law duty may frustrate the right of an employee to report his employer's illegal conduct to the appropriate government agency. *See* N.J.S.A. 34:19–1 to 34:19–8 (New Jersey's whistleblower statute) as well as *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58, 72, 417 A.2d 505, 512 (1980) (creating public policy exception to at-will employment) and its progeny. Thus, defendant's motion for summary judgment is denied.

### IV. CONCLUSION

By this opinion and its accompanying order, plaintiff's claims alleging failure to promote in 1992 and retaliation, as well as all of plaintiff's claims arising under § 1981, are dismissed. The claims that survive summary judgment are plaintiff's Title VII, ADEA, and NJLAD claim for discriminatory transfer/failure to promote in 1991 and defendant's counterclaim.

## OPINION ON RECONSIDERATION

IRENAS, District Judge:

Plaintiff Farid Khair has filed a motion for reconsideration of the Court's June 12, 1995 Opinion pursuant to Local Rule 12(I). We adopt the factual background section of that Opinion. Plaintiff argues that the Court incorrectly dismissed plaintiff's *Patterson*-based discriminatory transfer/failure to promote claim, plaintiff's national origin and age discrimination claims for failure to promote in 1992, and plaintiff's retaliation claims against his employer Campbell Soup Company ("Campbell"). Because plaintiff has presented facts of which the the Court was not cognizant before rendering its June 12, 1995 Order, we shall reinstate plaintiff's 1992 failure to promote and 1992 retaliatory failure to promote claims, but otherwise deny plaintiff's reconsideration motion.

### I. STANDARD OF REVIEW

■ To have an order vacated or modified upon a motion for reconsideration, a plaintiff must come forward with something new or something overlooked by the court in rendering the earlier decision. *See generally Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir.1985), *cert. denied*, 476 U.S. 1171, 106 S.Ct. 2895, 90 L.Ed.2d 982 (1986); *Canale v. Yegen*, 789 F.Supp. 147 (D.N.J.1992); *Pelham v. United States*, 661 F.Supp. 1063, 1065 (D.N.J.1987). Motions for reargument succeed only where "dispositive factual matters or controlling decisions of law" were presented to the court but not considered. *Pelham*, 661 F.Supp. at 1065. However, the court may not be directed to "matters which were not originally presented, but which have since been provided for consideration." *Florham Park Chevron, Inc. v. Chevron U.S.A., Inc.*, 680 F.Supp. 159, 162 (D.N.J. 1988).

### II. DISCUSSION

#### A. Cognizability of Plaintiff's Discriminatory Transfer/Failure to Promote Claim Under § 1981

Plaintiff first objects to our decision to dismiss his § 1981 discriminatory trans-

fer/failure to promote claim. Section 1981 guarantees "[a]ll persons within the jurisdiction of the United States . . . the same right . . . to make and enforce contracts[.]" 42 U.S.C. § 1981. *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) held that failure to promote claims are cognizable under § 1981 only if the position denied rises to the level of a "new and distinct relation" with the employer. *Patterson,* 491 U.S. at 185, 109 S.Ct. at 2377. The Supreme Court cautioned lower courts against "strain[ing] in an undue manner" the statutory phrase "the same right . . . to make . . . contracts[.]" *Id.* The Third Circuit has held that a new and distinct relationship is created when "the terms of the contract as to duties, tenure, compensation or essential function" would change with the promotion. *Bennun v. Rutgers State University,* 941 F.2d 154, 169 (3d Cir. 1991), *cert. denied,* 502 U.S. 1066, 112 S.Ct. 956, 117 L.Ed.2d 124 (1992).

In our June 12, 1995 Opinion, we held that Khair's claim was outside the scope of *Patterson* because the promotion given to Sherry Miller in April, 1991 was similar to the job that Khair had held managing the general ledger prior to his move to the PensionManager position, except in terms of salary. Plaintiff argues that, in addition to salary, he was denied (1) bonuses, (2) stock options and enhanced severance benefits, (3) increased responsibilities, (4) enhanced opportunity to further his career, and (5) more job security.

As to job security, plaintiff maintains that Campbell's decision to centralize the general ledger function and put Miller in charge of it "virtually guaranteed" Miller's job. (Pl. Br. at 4.) This virtual guarantee does not rise to the level of change required by *Patterson.* Examples of valid § 1981 claims involving increased job security include a move from at-will employment status to a position in which one can be fired for cause only, *see Harper v. Godfrey Co.,* 45 F.3d 143, 147 (7th Cir.1995), or a change from law firm associate to partner, *see Patterson,* 491 U.S. at 185, 109 S.Ct. at 2377 (citing *Hishon v. King & Spalding,* 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)). These promotions, which actually changed the employment sta-

tus of the plaintiffs involved, are distinguishable from Miller's promotion, which gave her no more guarantees than she had had in her previous position or that Khair had had when he managed the general ledger.

■ Next we consider the increased opportunities for promotion that Miller earned from her promotions. None of the cases that plaintiff has cited or that we have examined has considered this element. Rather, what is important is the promotion involved, not where a plaintiff could possibly go from there. There are too many variables involved, e.g., changes in market conditions and the employee's actual performance on the job, to consider this factor. After all, Campbell's decision to centralize could have been reversed soon after Miller's promotion, just as Campbell's decision to place more responsibility for accounting functions with the plants rather than at Campbell headquarters was reversed with the decision to centralization, *see* June 12, 1995 Opinion at 327.

■ Third, plaintiff points to the increased responsibilities of Miller's new position. While the responsibilities of the job may have increased, the "essential function" of the job did not change. *Bennun,* 941 F.2d at 169. Miller was still performing the same tasks that Khair had previously done, i.e., administering the general ledger. The Seventh Circuit in *Harper* refers favorably to a district court case which concluded that a promotion must involve " 'distinctly different' " responsibilities to be considered a promotion under *Patterson. Harper,* 45 F.3d at 147 (quoting *Luddington v. Indiana Bell Telephone Co.,* 796 F.Supp. 1550, 1560 (S.D.Ind.1990), *aff'd on other grounds,* 966 F.2d 225 (7th Cir.1992), *cert. denied,* —— U.S. ——, 114 S.Ct. 1641, 128 L.Ed.2d 362 (1994)). Specifically, *Luddington* held that a job change where the number of employees managed by a supervisor increased was not within the scope of *Patterson.* 796 F.Supp. at 1560. We find that in this context, where the number of transactions handled by Miller increased, is also not a cognizable claim.

■ The only remaining issues are the bonuses, stock options, and enhanced severance benefits which Miller received because

the number of transactions that she managed increased. Just as increased, but not different, responsibilities do not create a "new and distinct" employment relationship, the benefits awarded for those increased responsibilities is insufficient for a § 1981 claim. *See Harrison v. Associates Corp. of North America*, 917 F.2d 195, 198 (5th Cir.1990) ("[A] raise which is accompanied by no significant change in duties and responsibilities does not reach the level of a change in employment relationship protected by § 1981.").

■■■ As was noted in *Wall v. Trust Co.*, 946 F.2d 805, 808 (11th Cir.1991), "each step down the path of one's career does not create a new and distinct relation with the employer for purposes of the *Patterson* test." Plaintiff's motion for reconsideration on this claim is denied.

### B. *Plaintiff's 1992 Failure to Promote Claim*

■■■ Plaintiff next asks the Court to reconsider its decision to dismiss plaintiff's claim that he was not promoted to the position of Manager–Centralized General Ledger in late 1992 because of discrimination. The key decisionmaker in this promotion was Sherry Miller, whose supervisor was John Shimrak. The business justification offered by Campbell was that Miller believed that Khair's management style conflicted with her own. We granted summary judgment on this claim because the plaintiff emphasized Shimrak's interference in the selection process as one reason why Campbell's business justification was pretextual, and yet the plaintiff did not show the Court that any interference had actually occurred.

In re-reading plaintiff's summary judgment papers in conjunction with the reconsideration papers, we realize that plaintiff's argument was two-fold: first, Shimrak allegedly influenced Miller's decision, and second, Miller's reasons for not hiring Khair are pretextual. To support the latter argument,

Khair claims: (1) Khair had more experience with Campbell's general ledger than any other candidate for the position (a fact admitted by Miller), (2) none of performance reviews on file before Miller's decision mention any management style concerns,[1] (3) Miller never had the opportunity to observe Khair's management style, and (4) Miller never discussed Khair's abilities with Lyons, Khair's supervisor at the time of the application process. This argument does cast doubt on Sherry Miller's reason for not promoting Khair. Since plaintiff has presented evidence to show that Campbell's legitimate, nondiscriminatory reason is false, the 1992 failure to promote claim may proceed to trial. *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir.1994); *see also Sempier v. Johnson & Higgins*, 45 F.3d 724, 731–32 (3d Cir.1995) (summary judgment denied where failure to fault plaintiff's performance made defendant's charge of poor performance suspect), *cert. denied*, —— U.S. ——, 115 S.Ct. 2611, 132 L.Ed.2d 854.

### C. *Plaintiff's Retaliation Claims*

#### 1. 1991 Annual Review

Khair received his 1991 annual review in March, 1992, in which he received his lowest overall performance rating of "3." Plaintiff claims he received this low rating because he filed an EEOC charge on January 10, 1992. We held that Khair had met the requirements of a prima facie case of retaliation[2] but could not defeat summary judgment because he had only offered the one review as proof that his supervisor, John T. Lyons, had retaliated against Khair, which was insufficient for a jury to find that retaliation was the true motivation for the lowered performance rating.

■■■ Plaintiff argues that the Court should have considered the role that Shimrak played in Khair receiving the "3" rating. Pursuant to Campbell's automatic salary in-

---

**1.** The performance review for 1992 (dated March 9, 1993) does state that Khair needs to get more involved with his subordinates in order to grow as a manager. Pl.Ex. 10.

**2.** A plaintiff has established a prima facie case of retaliation by showing: (1) that he was engaged in a protected activity, (2) that he suffered an adverse employment decision, and (3) that there was a causal connection between the protected activity and the adverse employment decision. *Nelson v. Upsala College*, 51 F.3d 383, 386 (3d Cir.1995)

crease policy, it was Shimrak, Khair's former supervisor, who had given Khair a "3" rating back in mid–1991, before Khair had done any significant work on the PensionManager installation project (the "kickoff organization meeting" of the project was not until May 9, 1991, *see* Pl.Ex. 26). Such a rating could only be changed if, at the time the review was actually filled out, the supervisor justified a departure from the predicted rating and secured the required signatures.[3] Lyons did not change Khair's "3" rating, and Shimrak approved Khair's 1991 annual review. Plaintiff argues that Shimrak should not have approved the "3" rating, given the laudatory comments that Lyons wrote about Khair.

This information only buttresses the Court's decision to enter summary judgment on this claim. Shimrak may have given Khair an unfavorable rating because of discriminatory animus, but he did so in mid–1991—before plaintiff had filed his EEOC charge. While this rating may be evidential to plaintiff's theory that Campbell was setting Khair up for termination, it is not proof of retaliation. Nor do we find Shimrak's failure to raise Khair's grade evidence of retaliation since Khair's direct supervisor (Lyons) was unwilling to depart from the previous rating.

2. Rejection for 1992 Promotion

■ Plaintiff moves the Court to reconsider its dismissal of plaintiff's claim that he was not promoted in 1992 to the position of Manager–Centralized General Ledger because of retaliation. We granted summary judgment on this claim because we found that a jury would have no reason to find that Miller had considered plaintiff's EEOC charge when she decided not to promote Khair.

Plaintiff now points to proof that Miller could have known about Khair's EEOC com-

plaint prior to deciding not to promote Khair, despite her claim to the contrary.[4] Miller admits to at least skimming Khair's performance reviews, and Khair's 1991 annual review contained his comment that he had filed an EEOC complaint. The Court has already concluded that plaintiff has evidence to support an inference that Campbell's business justification for not promoting Khair was pretextual.[5] Since Miller may have known about Khair's EEOC filing, plaintiff also has produced sufficient evidence to support an inference that Campbell's rationale for not promoting Khair was retaliatory. Summary judgment on this claim shall be vacated.

3. 1992 Annual Review

■ Finally, plaintiff argues that we should not have dismissed the retaliation claim regarding his 1992 review, which was written by Lyons and which plaintiff received in March, 1993. Plaintiff claims we dismissed these claims because we held that Khair could not prove causation, the third element of a prima facie case for retaliation. On the contrary, the Court's decision states: "The causation requirement is met since Lyons knew of plaintiff's EEOC charge." Op. at 336.

What the Court held was that plaintiff failed to present any evidence that Khair's EEOC charge was the likely reason for the negative comments in his review, and therefore he cannot meet his burden on the third stage of the analytical framework of a retaliation claim. *See Colgan v. Fisher Scientific Co.,* 935 F.2d 1407, 1421–22 (3d Cir.), *cert. denied,* 502 U.S. 941, 112 S.Ct. 379, 116 L.Ed.2d 330 (1991); *Jalil v. Avdel Corp.,* 873 F.2d 701, 708–09 (3d Cir.1989), *cert. denied,* 493 U.S. 1023, 110 S.Ct. 725, 107 L.Ed.2d 745 (1990). The Court noted that the temporal proximity was missing here; i.e., Khair received his 1992 review more than a year after he filed his EEOC charge.[6] We also stated

---

3. A departure was not encouraged by Campbell's management. *See* Pl.Ex. 23 ("These departures will be challenged; they will require justification and additional approvals. To avoid delays and extra work, prepare your salary plan thoughtfully.")

4. This proof was not referred to in plaintiff's summary judgment papers; however, it was pro-

vided to the Court in plaintiff's summary judgment exhibits and is therefore not outside of the bounds of *Florham Park.*

5. *See supra* part II.B.

6. The plaintiff misread our Opinion as holding that the timing was the only reason for dismissing this retaliation claim. However, the timing

that plaintiff did not believe that Lyons had discriminated against him. (Khair Dep. at 159.) In fact, the "4" rating that Lyons gave the plaintiff was higher than the rating Lyons gave Khair *before* he learned about Khair's EEOC charge. Additionally, plaintiff has not demonstrated that the negative comments in his review were not deserved; he merely alleges that they were unfounded.

Plaintiff argues we cannot isolate this claim from the context of Khair's other claims for discrimination. However, Lyons is a different actor, and we cannot impute the motivations of other employees of Campbell to Lyons without a basis in fact. In sum, all plaintiff has presented to support an inference of pretext is a performance review with critical comments, and this is insufficient to survive summary judgment. *See Colgan,* 935 F.2d at 1423; *see also, Fuchilla v. Prockop,* 682 F.Supp. 247, 263 (D.N.J.1987) (summary judgment granted when plaintiff presented no evidence outside of the allegations in her pleadings). Plaintiff's reconsideration motion on the retaliation claim regarding the 1992 annual review is denied.

### III. CONCLUSION

By this Opinion and our June 12, 1995 Opinion, plaintiff's claims alleging retaliation for plaintiff's 1991 and 1992 annual review, as well as all of plaintiff's claims arising under § 1981, are dismissed. The claims that survive summary judgment are plaintiff's Title VII, ADEA, and NJLAD claims for discriminatory transfer/failure to promote in 1991; plaintiff's Title VII, ADEA, § 1981, and NJLAD claims for failure to promote in 1992; plaintiff's Title VII, ADEA, § 1981, and NJLAD claim for retaliatory failure to promote in 1992; and defendant's counterclaim.

An Order in accordance with this Opinion shall be filed on even date herewith.

---

issue was just one reason that the Court found a lack of pretext. Thus, plaintiff's references to *Robinson v. SEPTA,* 982 F.2d 892, 895–96 (3d Cir.1993) and *San Filippo v. Bongiovanni,* 30 F.3d 424, 444 (3d Cir.1994), *cert. denied,* — U.S. ——, 115 S.Ct. 735, 130 L.Ed.2d 638 (1995) are unpersuasive. The facts of these two cases are also distinguishable. The plaintiff in *Robinson* endured a pattern of harassment not present in this case, and the plaintiff in *San Filippo* engaged in multiple episodes of protected activity while Khair's retaliation claims involve only one EEOC filing.